**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

MICHAEL BOND,

                Plaintiff,

     v.

JOHNSON & JOHNSON and
ETHICON, INC.;

                Defendants.

KENNETH ROSEBUSH,

                Plaintiff,

     v.

JOHNSON & JOHNSON and
ETHICON, INC.;

                Defendants.

Civ. Action No. 21- 05327 (FLW)
Civ. Action No. 21- 05333 (FLW)

**OPINION**

**WOLFSON, Chief Judge**:

    Before the Court are two separate motions (the "Motions") filed by defendants Johnson &
Johnson ("J&J") and Ethicon, Inc. ("Ethicon") (collectively, "Defendants") to dismiss each of the
Complaints initiated by plaintiffs Michael Bond and Kenneth Rosebush (collectively, "Plaintiffs") in
the respective matters captioned above. Both Plaintiffs allege that they sustained injuries resulting
from the surgical implantation of one of Defendants' mesh hernia repair products. Plaintiffs assert
strict products liability claims pursuant to the New Jersey Products Liability Act ("NJPLA"),
N.J.S.A. 2A:58C-1, *et seq.*, for defective design (Count One), failure to warn (Count Two), and

manufacturing defect (Count Three). In the alternative, Plaintiffs submit that, "[t]o the extent the Court chooses to apply the law of a state other than New Jersey," they would assert claims under the law of the state where they underwent their respective surgeries: for Bond, North Carolina; and for Rosebush, Michigan. Plaintiffs assert claims for negligence (Count Four), design defect (Count Five), failure to warn (Count Six), manufacturing defect (Count Seven), breach of implied warranty (Count Eight), breach of express warranty (Count Nine), and punitive damages (Count Ten). Because both cases involve the same product and similar factual circumstances, I address both Motions in this Opinion. Plaintiffs oppose the Motions.

For the reasons set forth herein, Defendants' Motions are **GRANTED**. With respect to Rosebush, Counts One, Two, Three, Five, Six, Seven and Ten are dismissed with prejudice; however, Count Four, which alleges claims under Michigan law for design defect, manufacturing defect, and failure to warn, is dismissed without prejudice, and Rosebush is given leave to amend his Complaint, within twenty-one (21) days from the date of the accompanying order, in accordance with this Opinion; and Counts Eight and Nine of Rosebush's Complaint are also dismissed without prejudice. With respect to Bond, all counts are dismissed with prejudice.

## I.    BACKGROUND AND PROCEDURAL HISTORY

The relevant facts are derived from Plaintiffs' Complaints and assumed as true for the purposes of these Motions.

Defendants J&J and Ethicon, a wholly owned subsidiary of J&J, are incorporated, and maintain their principal places of business, in New Jersey. Bond and Rosebush Complaints ("Compls."). ¶6. Ethicon manufactures a mesh medical device, named the Prolene 3D Patch ("Prolene 3D"), which is used in hernia repair surgeries. Compls. ¶¶1–2, 20. Mesh patches, such as the Prolene 3D, are intended to "to provide additional support to weakened or damaged tissue" caused

by a hernia.[1]

According to Plaintiffs, the Prolene 3D has two features that are relevant to this litigation. First, the Prolene 3D utilizes the "Ethicon Multi-Layered Hernia Mesh," "which incorporates two distinct layers of polypropylene." Compls. ¶¶2, 26. The first layer is a "flat mesh," whereas the second is an "expandable diamond-shaped mesh patch," and the two layers "are connected together by a single central polypropylene suture." *Id.* ¶26. Second, according to Plaintiffs, "[t]he diamond-shaped mesh patch portion of the Prolene 3D is a type of mesh 'plug.'" *Id.* ¶27. Plaintiffs allege that "Defendants never performed any clinical trials and/or studies before marketing Ethicon Multi-Layered Hernia Mesh, including the Prolene 3D," and that they "did not fully and/or adequately test these new, multi-layered hernia mesh devices." *Id.* ¶¶37–38.[2]

Plaintiffs allege that the design of the Prolene 3D is defective. First, Plaintiffs claim that the "plug" design used in the Prolene 3D conflicts with guidance published in the *International Guidelines for Groin Hernia Management* ("International Guidelines") *Id.* ¶28.[3] According to the

---

[1]  *Hernia Surgical Mesh Implants*, U.S. Food and Drug Admin. (Feb. 4, 2018), https://www.fda.gov/medical-devices/implants-and-prosthetics/hernia-surgical-mesh-implants (last visited Dec. 3, 2021). While Plaintiffs do not provide any explanation in their Complaints as to the intended function of mesh surgical patches used in hernia repair procedures, the Court takes judicial notice of this fact. *See Sparks v. Medtronic, Inc.*, Civ. No. 19-16853, 2021 WL 2649235, at *2 (M.D. Fla. June 28, 2021) (citing, *e.g.*, *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011)) (taking judicial notice in hernia mesh products liability suit of information from the same FDA publication).

[2] Plaintiffs make clear in their Opposition briefs that the Prolene 3D entered the market pursuant to Section 510(k) of the Food, Drug and Cosmetic Act, as a device that is "substantially equivalent" to a device that the FDA had already approved. *See* Plaintiff Michael Bond's Response in Opposition and Supporting Memorandum to Defendants' R. 12(b)(6) Motion to Dismiss ("Bond Opp."), ECF No. 12 at 29; Plaintiff Kenneth Rosebush's Response in Opposition and Supporting Memorandum to Defendants' R. 12(b)(6) Motion to Dismiss ("Rosebush Opp."), ECF No. 12 at 25.

[3] Plaintiffs maintain that the "Guidelines were endorsed by the European Hernia Society, Americas Hernia Society, Asia Pacific Hernia Society, Afro Middle East Hernia Society, Australasian Hernia Society, International Endo Hernia Society, and European Associated for Endoscopic Surgery and Other Interventional Techniques." Compls. ¶28.

International Guidelines, "[t]he incidence of erosion seems higher with plug versus flat mesh. It is suggested not to use plug repair techniques." *Id.* ¶28. Second, Plaintiffs allege that the "multiple layers of Ethicon Multi-Layered Hernia Mesh increase the intensity and duration of the inflammatory response in Defendants' hernia repair devices," including the Prolene 3D. *Id.* ¶36. "That response," Plaintiffs explain, "increases dense adhesion formation from underlying structures and organs to the product, resulting in mesh contracture, mesh deformation, chronic pain, foreign body sensation, foreign body reaction, organ and tissue damage, hernia recurrence, and more." *Id.* ¶36.[4] Finally, Plaintiffs allege that the "polypropylene mesh material" used in the Prolene 3D "is unreasonably susceptible to in vivo oxidative degradation," which allegedly "causes or exacerbates excessive inflammation and adverse foreign body reaction, leading to shrinkage, scarification, pain, and mesh deformation." *Id.* ¶31.[5] Plaintiffs further allege that "feasible, alternative safer designs were known and available" to Defendants. *Id.* ¶47. Those alternatives include "a flat, non-coated, single-layer, lightweight, large-pore mesh, or a fully resorbable mesh." *Id.*

On March 17, 2009, Plaintiff Bond, a resident of North Carolina, underwent surgery to repair a "bilateral inguinal hernia" at a hospital in Raleigh, North Carolina. Bond Compl. ¶¶6, 20. During the surgery, Bond's surgeon implanted the Prolene 3D in Bond's groin. *Id.* More than ten years later, on April 26, 2019, Bond underwent another round of surgery to repair a "left inguinal hernia" and remove mesh from the site of his 2009 surgery. *Id.* ¶21. Bond's 2019 surgery also took place in Raleigh, North Carolina. *Id.* During the 2019 surgery, Bond's surgeon "noticed that [Bond] had a

---

[4] As Plaintiffs allege, the "two connecting layers of polypropylene [are] intended to occupy two inguinal compartments once implanted, which greatly increases inflammation, adhesions, and mesh deformation." Compls. ¶46.

[5] Notably, Plaintiffs do not define many terms used in their Complaints that are not common or self-explanatory, including "dense adhesion," "in vivo oxidative degradation," and "foreign body reaction."

'scarred and balled up' mesh in the direct space," *id.*, which presumably refers to the site of Bond's previous hernia, although Plaintiff does not elaborate. Bond's surgeon was required to "'tediously dissect[]'" the "'balled up' mesh . . . from the inferior epigastric vessels and spermatic cord structure." *Id.* The surgeon then repaired Bond's hernia using another mesh device. *Id.* ¶22.

On August 11, 2009, Plaintiff Rosebush, a resident of Michigan, underwent surgery at a hospital in Flint, Michigan, to repair an "umbilical hernia." Rosebush Compl. ¶¶6, 20. The surgeon implanted a Prolene 3D in Rosebush's abdomen to repair the hernia. *Id.* Almost ten years later, on January 18, 2019, Rosebush underwent another round of surgery, also in Michigan, to remove mesh from the site of his previous surgery. *Id.* ¶21. During his 2019 surgery, Rosebush's surgeon discovered "dense adhesions [a]round the umbilical mesh" that was "previously placed" in Rosebush's abdomen during his 2009 surgery. *Id.* Rosebush alleges that a "portion of the small bowel was resected with [*sic*] portion of the mesh and removed." *Id.*

On March 16, 2021, Plaintiffs filed complaints in this Court asserting various causes of action pertaining to alleged injuries they suffered from the Prolene 3D. Both Plaintiffs assert strict products liability claims pursuant to N.J.S.A. 2A:58C-1, *et seq.*, for defective design (Count One), failure to warn (Count Two), and manufacturing defect (Count Three). Both Plaintiffs also, respectively, assert common law claims under the laws of Michigan and North Carolina for negligence (Count Four), strict liability design defect (Count Five), strictly liability failure to warn (Count Six), strict liability manufacturing defect (Count Seven), breach of implied warranty (Count Eight), and breach of express warranty (Count Nine). Plaintiffs also assert claims for punitive damages (Count Ten). Defendants moved to dismiss both Plaintiffs' Complaints, on all counts, pursuant to Rule 12(b)(6) on May 20, 2021. *See* Motion to Dismiss Bond's Complaint ("Bond Mtn."), ECF No. 10; Motion to Dismiss Rosebush's Complaint ("Rosebush Mtn."), ECF No. 10. Plaintiffs opposed the motions on June 22, 2021. Bond Opp., ECF No. 12; Rosebush Opp., ECF No. 12. Defendants filed their Reply

Briefs on June 29, 2021. Reply Brief in Support of Defendants' Motion to Dismiss ("Bond Reply"), ECF No. 13; Reply Brief in Support of Defendants' Motion to Dismiss ("Rosebush Reply"), ECF No. 13.

## II.     LEGAL STANDARD

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6), "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks and citation omitted).  While Federal Rule of Civil Procedure 8(a)6 does not require that a complaint contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  Thus, to survive a Rule 12(b)(6) motion to dismiss, the complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Id.* at 570; *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To determine whether a plaintiff has met the facial plausibility standard mandated by *Twombly* and *Iqbal*, courts within this Circuit engage in a three-step progression. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court must "outline the elements a plaintiff must plead to state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Next, the court "peel[s] away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." *Id*. Finally, where "there are well-pleaded factual allegations, the court

should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

## III.   DISCUSSION

### A.   Counts One, Two, Three, Four, Five, Six, and Seven

I begin by addressing Counts One through Seven, which assert claims for strict liability and negligence, as to both Plaintiffs. After applying the relevant choice-of-law principles, I conclude that Michigan and North Carolina substantive law apply, respectively, to Rosebush's and Bond's claims in Counts One through Seven. Under the applicable state's law, Counts One, Two and Three are dismissed with prejudice as to both Rosebush and Bond, as these counts assert strict liability claims under New Jersey law that are not cognizable in Michigan or North Carolina. With respect to Rosebush, Counts Five, Six, and Seven are also dismissed with prejudice, as Michigan does not recognize strict liability in products liability actions. Rosebush's negligence claim in Count Four is cognizable under Michigan law, and although I conclude that he has failed to state a claim, Count Four of his Complaint is dismissed without prejudice, and he is given leave to amend. With respect to Bond, Counts Four, Five, Six and Seven of his Complaint are barred by a six-year statute of repose applicable to these counts under North Carolina law, and these counts in Bond's Complaint are therefore dismissed with prejudice.

### 1.   *Choice of Law*

"[I]n a diversity action, a district court must apply the choice of law rules of the forum state to determine what law will govern the substantive issues of a case." *Warriner v. Stanton*, 475 F.3d 497, 499–500 (3d Cir. 2007). Because "[t]his diversity action was initiated in the United States District Court for the District of New Jersey," the Court must apply New Jersey's choice of law rules. *Id.* at 500.

New Jersey's choice of law rules follow the Restatement (Second) of the Conflict of Laws. *See P. V. v. Camp Jaycee,* 197 N.J. 132, 142–43 (2008). "[T]he first step is to determine whether an actual conflict exists." *Id.* at 143. An "actual conflict" exists when choosing between two states' laws would be "outcome determinative." *McCarrell v. Hoffmann-La Roche Inc.,* 227 N.J. 569, 584 (2017) (citing *Rowe v. Hoffmann-La Roche, Inc.,* 189 N.J. 615, 621 (2007)) ("[A] true conflict of law arises when choosing between one or another state's statute of limitations is outcome determinative."); *Camp Jaycee,* 197 N.J. at 143–44 (finding conflict where New Jersey law made charitable organizations immune from most forms of tort liability whereas Pennsylvania law subjected charitable organizations to tort liability). The Court must determine whether a conflict exists "on an issue-by-issue basis." *Rowe,* 189 N.J. at 621 (internal quotations and citations omitted). "If there is no actual conflict, then the choice-of-law question is inconsequential," and the Court would apply the law of the forum state—here, New Jersey— "to resolve the disputed issue." *Id.*

If a conflict exists, "the Court must determine which state has the most significant relationship to the claim, by weigh[ing] the factors set forth in the Restatement section corresponding to the plaintiff's cause of action." *Arlandson v. Hartz Mountain Corp.,* 792 F. Supp. 2d 691, 699 (D.N.J. 2011) (internal quotations and citation omitted); *Camp Jaycee,* 197 N.J. at 143 (concluding courts must "apply the Second Restatement's most significant relationship standard in tort cases"). "In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship." Rest. (Second) of Conflict of Laws § 146; *Camp Jaycee,* 197 N.J. at 143 ("[T]he law of the state of the injury is applicable unless another state has a more significant relationship to the parties and issues."). To determine whether another state "has a more significant relationship" than the state where the injury occurred, courts must examine "the remaining contacts set forth in sections 145 and . . . 6" of the Restatement. *Camp Jaycee,* 197 N.J. at 144–45. Section

145 provides that, "in applying the principles of § 6," the relevant contacts are: "(a) the place where the injury occurred[;] (b) the place where the conduct causing the injury occurred[;] (c) the domicil, residence, nationality, place of incorporation and place of business of the parties[;] and (d) the place where the relationship, if any, between the parties is centered." Rest. (Second) of Conflict of Laws § 145. And, "[r]educed to their essence, the section 6 principles are: (1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." *Camp Jaycee*, 197 N.J. at 147 (internal quotations and citations omitted).

Here, the Court first finds that conflicts exist with respect to Counts One through Seven as to both plaintiffs. With respect to Rosebush, a conflict exists as to his strict liability claims under Counts One through Three and Five through Seven, as well as his negligence claim in Count Four. In New Jersey, plaintiffs must bring "claims for 'harm caused by a product'" under the NJPLA. *Sinclair v. Merck,* 195 N.J. 51, 65–66 (2008) (quoting N.J.S.A. 2A:58C-1(b)(3)) (concluding products liability claim must be brought under the NJPLA because "the Legislature expressly provided . . . that claims for 'harm caused by a product' are governed by the [NJ]PLA 'irrespective of the theory underlying the claim'"); *Mills v. Ethicon, Inc.*, 406 F. Supp. 3d 363, 374 (D.N.J. 2019) ("The NJPLA is the 'sole basis of relief under New Jersey law available to consumers injured by a defective product.'") (quoting *Repola v. Morbark Industries, Inc.*, 934 F.2d 483, 492 (3d Cir. 1991)). "[N]egligence and breach of [implied] warranty are not permitted as separate claims for injuries caused by defective products." *Petrokehagias v. Sky Climber, Inc.*, Civ. No. 96-6965, 1998 WL 227236, at *5 (E.D. Pa. May 4, 1998) (citing *Oguendo v. Bettcher Industries, Inc.*, 939 F. Supp. 357 (D.N.J.1996), *aff'd* 118 F.3d 1577 (3d Cir.1997)). In contrast, Michigan does not recognize strict liability in products liability cases, and instead only recognizes actions for negligence and breach of implied warranty. *Magnant v. Medtronic, Inc.,* 818 F. Supp. 204, 206 (W.D. Mich. 1993) (citing *Prentis v. Yale Mfg. Co.*, 421

Mich. 670, 683 (1984)) (recognizing conflict of law because "Michigan does not accept strict liability" in products liability actions, whereas Minnesota "recognizes claims based on the theory of strict liability in actions against manufacturers for product defects that cause personal injury"); *Hartford Fire Ins. Co. v. Walter Kidde & Co.*, 120 Mich. App. 283, 291 (1982) (holding Michigan only recognizes negligence and breach of implied warranty as causes of action in products liability cases). Thus, Rosebush's strict liability claims in Counts One through Three and Five through Seven are not cognizable under Michigan law, and his common law negligence claim in Count Four is not cognizable under New Jersey law, as it must be brought under N.J.S.A. 2A:58C-2. *See Mills*, 406 F. Supp. 3d at 374–75 (finding conflict where "Pennsylvania law allows negligence and breach of warranty claims, but New Jersey only allows one statutory cause of action for strict liability") (internal quotations and citations omitted).

With respect to Bond, a conflict exists as to his strict liability claims under Counts One through Three and Five through Seven, as well as his negligence claim in Count Four, for reasons similar to those supporting a conflict in Rosebush's case. As noted *supra*, in New Jersey, plaintiffs must bring products liability actions under New Jersey's strict liability statute. *See Sinclair*, 195 N.J. at 65–66; *Mills*, 406 F. Supp. 3d at 375. In contrast, North Carolina does not recognize "strict liability in tort in product liability actions." N.C. Gen. Stat. § 99B-1.1. As such, none of Bond's strict liability claims in Counts One through Three and Five through Seven are cognizable under North Carolina law, and Bond's negligence claim under Count Four is not cognizable under New Jersey law. *See Mills*, 406 F. Supp. 3d at 375 ("When two states authorize different causes of action arising out of the same set of facts, a conflict exists between the laws of the two states."). Further, another conflict exists because, unlike New Jersey, a six-year statute of repose applies to Bond's product liability claims under North Carolina law, which, for reasons discussed *infra*, bar Bond's claims in Counts Four through Seven.

Having concluded that a conflict exists as to Counts One through Seven for both Plaintiffs with respect to the applicable substantive law, I next apply the "most significant relationship" test based on the factors set forth in the Restatement. *Arlandson*, 792 F. Supp. 2d at 699. Here, there is a strong presumption that Michigan law applies with respect to Rosebush, and that North Carolina law applies with respect to Bond, because Plaintiffs incurred their injuries in those states. *See Camp Jaycee,* 197 N.J. at 144 ("Section 146 recognizes the intuitively correct principle that the state in which the injury occurs is likely to have the predominant, if not exclusive, relationship to the parties and issues in the litigation."). Rosebush and Bond underwent both their initial implantation surgeries, as well as their corrective surgeries, in Michigan and North Carolina, respectively. *See* Compls. ¶¶20–21.

New Jersey does not have a more significant relationship than Michigan and North Carolina, respectively, under the factors set forth in Section 145 of the Restatement. *Camp Jaycee*, 197 N.J. at 144–45. The places where Rosebush's and Bond's injuries occurred are Michigan and North Carolina. *See* Rest. (Second) of Conflict of Laws § 145(2)(a). Likewise, the "conduct causing [Rosebush and Bond's] injur[ies]," *id.* § 145(2)(b), primarily occurred in Michigan and North Carolina, respectively, as Plaintiffs underwent their implantation and corrective surgeries in those states. *See* Compls. ¶¶20–21. "'[W]hen both conduct and injury occur in a single jurisdiction, with only rare exceptions, the local law of the state where conduct and injury occurred will be applied to determine an actor's liability.'" *Camp Jaycee*, 197 N.J. at 145 (quoting *Fu v. Fu*, 160 N.J. 108, 125–26 (1999)). Rosebush and Bond are also domiciled in Michigan and North Carolina, respectively, and these are also the states "where the relationship[s] . . . between the parties [are] centered." *See* Rest. (Second) of Conflict of Laws § 145(2)(c)–(d).

New Jersey's contacts do not outweigh the factors supporting application of Michigan and North Carolina law. Certain conduct causing Plaintiffs' injuries allegedly occurred in New Jersey,

where Defendants designed the Prolene 3D, and Defendants also maintain their principal places of business in New Jersey. However, courts within the Third Circuit have concluded repeatedly that, in a products liability action, these contacts typically do not outweigh those of the state where an injury occurs. *See Mills*, 406 F. Supp. 3d at 375–76 (applying law of state—Pennsylvania—where plaintiff resided, used an allegedly defective mesh surgical product, and incurred an injury, and finding one defendant's incorporation in New Jersey insufficient to override Pennsylvania's contacts); *Knipe v. SmithKline Beecham*, 583 F. Supp .2d 602, 615–16 (E.D. Pa. 2008). In *Knipe*, plaintiffs who resided in New Jersey received prescriptions for a certain drug from physicians in New Jersey, filled those prescriptions in New Jersey, and allegedly incurred injuries due to the drug in New Jersey. 583 F. Supp. 2d at 615–16. The manufacturer of the drug was incorporated, and maintained its principal place of business, in Pennsylvania. *Id.* at 616. *Knipe* concluded, based on New Jersey's and Pennsylvania's contacts, "that New Jersey unequivocally maintains substantively greater contacts with the dispute at bar." *Id.* at 615. The same calculus applies, here. As in *Knipe*, "[t]he mere fact that [Defendants] reside[] in [New Jersey] and conduct[] some business there simply does not outweigh [Michigan's and North Carolina's] dual interests of protecting [their] citizens and regulating business conduct occurring within [their] borders." *Id.* at 616. Accordingly, based on the factors set forth in Section 145, Plaintiffs have not rebutted the "presumption," *Camp Jaycee*, 197 N.J. at 136, that Michigan and North Carolina law apply.

Neither do the factors set forth under Section 6 of the Restatement counsel in favor of applying New Jersey law. "First, the interests of interstate comity favor applying the law of the individual claimant's own state," as "[a]pplying New Jersey law to every potential out-of-state claimant would frustrate the policies of each claimant's state." *Maniscalco v. Brother Intern. (USA) Corp.*, 709 F.3d 202, 209 (3d Cir. 2013). Second, although the interests of the parties may diverge, *Maniscalco* recognized that both parties may have an interest in applying the law of the state where

12

their relationship centered, *id.* at 209–10, and as such, this factor is at best neutral. Likewise, because products liability law is premised on the dual policies of compensating injured parties and "regulat[ing] the conduct of manufacturers and distributors," *Mills*, 406 F. Supp. 3d at 375, the "third section 6 factor likely favors neither state." *Maniscalco*, 709 F.3d at 210 (finding third factor supported neither corporation's domicile nor plaintiff's home state because "[c]onsumer fraud law serves the dual purposes of compensating injured parties—which might favor [plaintiff's home state]—and deterring corporate misconduct—which might favor [state where corporation resided]"). As for the fourth factor, although the interests of judicial administration could favor New Jersey law in order to "further[] the values of uniformity and predictability of result," New Jersey courts have emphasized that "[these] considerations . . . are of lesser importance and must yield to a strong state interest implicated by the remaining factors." *Fu*, 160 N.J. at 124; *Maniscalco*, 709 F.3d at 210 (same). Finally, under the fifth and "most important[]" factor, the Third Circuit has concluded in the analogous consumer fraud context that the "the interest of [a state] in having its law apply to its own consumers outweighs the interests of New Jersey in protecting out-of-state consumers from" tortious conduct that allegedly originates in New Jersey. *Maniscalco*, 709 F.3d at 210. Accordingly, the Section 6 factors do not alter my conclusion that Michigan and North Carolina law apply to Rosebush's and Bond's claims in Counts One through Seven.

Plaintiffs' contention that a choice-of-law analysis is premature on a motion to dismiss is unavailing. In this regard, Plaintiffs cite to decisions within this district concluding that "the factual record" before the courts on a motion to dismiss were "not yet full enough to make a choice of law determination." *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 721 (D.N.J. 2011); *Arlandson*, 792 F. Supp. 2d at 699–700; *Harper v. LG Electronics USA, Inc.*, 595 F. Supp. 2d 486, 490–91 (D.N.J. 2009). However, these decisions involved "contract or quasi-contract claim[s]," which often require a "very fact-intensive inquiry." *Snyder*, 792 F. Supp. 2d at 721; *Harper*, 595 F.

Supp. 2d at 490–91. And all involved putative class actions. *See Arlandson*, 792 F. Supp. 2d at 699–700 (noting "Courts in this District have deferred the choice of law analysis until the class certification stage"); *Snyder*, 792 F. Supp. 2d at 716, 718 (same); *Harper*, 595 F. Supp. 2d at 488. In *Arlandson*, the court contrasted the "fact-intensive inquiry" applicable to a "contract or quasi-contract claim" with "the more straight forward choice of law analysis required for a products liability claim," and the court conducted a choice-of-law inquiry pertaining to the plaintiff's products liability claims. 792 F. Supp. 2d at 702, 705. Similarly, here, the choice-of-law inquiry applicable to Plaintiffs' product liability claims in a non-class action does not require further factual development, and Plaintiffs have not alerted the Court of any other types of information that would assist in its analysis.

Accordingly, for the foregoing reasons, Michigan and North Carolina substantive law applies to Counts One through Seven of Rosebush's and Bond's Complaints, and I now turn to the merits of those claims.

### 2. Counts One, Two, and Three: Rosebush and Bond

In Counts One, Two, and Three, Rosebush and Bond assert claims pursuant to New Jersey's strict products liability statute, N.J.S.A. 2A:58C-1, *et seq.*, for defective design, failure to warn, and manufacturing defect. Compls. ¶¶42–78. However, because Michigan and North Carolina substantive law applies to Rosebush's and Bond's claims, Counts One, Two, and Three are dismissed, as they assert claims under a New Jersey statute that do not exist under Michigan and North Carolina law. Counts Four, Five, Six, and Seven assert products liability claims under Michigan and North Carolina law, and I turn to those claims for each plaintiff in the following sections.

### 3. Counts Four, Five, Six, and Seven: Rosebush

Rosebush asserts products liability claims under Michigan law in Counts Four through Seven. In Counts Five, Six, and Seven, Rosebush asserts strict liability claims for design defect, failure to

warn, and manufacturing defect, respectively, under Michigan law. However, "Michigan does not accept strict liability as the basis of a [products liability] claim." *Magnant*, 818 F. Supp. at 206. Accordingly, these counts are dismissed with prejudice. In Count Four, Rosebush asserts a claim for negligence, which is cognizable under Michigan law, and as such, I will analyze Rosebush's products liability claims under that cause of action.

Michigan recognizes "[t]wo theories of recovery in products liability actions: . . . negligence and . . . implied warranty." *Hartford Fire*, 120 Mich. App. at 291. Under either cause of action, a plaintiff may bring a claim based on "'three types of defects: manufacturing defects, defects due to faulty design, and defects due to inadequate instructions or warnings.'" *Valente v. Oak Leaf Outdoors, Inc.,* Civ. No. 14-12892, 2015 WL 4488547, at *3 (E.D. Mich. July 23, 2015) (quoting *Fleck v. Titan Tire Corp.,* 177 F. Supp. 2d 605, 613 (E.D. Mich. 2001)). Claims based on negligence and breach of implied warranty are distinct insofar as "[t]he former is a tort action and the latter is an action for breach of contract," and in certain circumstances the two causes of action require distinct analyses. *Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 736 (6th Cir.2000). But "in cases where a seller is also the manufacturer," as is true of Defendants, here, "claims of negligence and breach of implied warranty are, for all intents and purposes, identical." *Id.* at 736–37.[6] "A suit for breach of implied warranty against a seller who is also the manufacturer will therefore require the same showing of negligence on the defendant's part as an ordinary products liability suit against a manufacturer." *Id.* at 737; *Paul v. Henri-Line Mach. Tools, Inc.*, 938 F. Supp. 2d 691, 700–01 (E.D. Mich. 2013).

---

[6] "When the defendant is a non-manufacturing seller, . . . the two analyses diverge." *Hollister*, 201 F.3d at 737 (citing *Prentis*, 421 Mich. at 692 n.30). "Because the existence of a defect is generally determined by the negligent conduct of the manufacturer, a retailer may be held liable for breaching its implied warranty of merchantability by selling a defective product, even if the retailer's conduct is wholly free from negligence." *Id.*

15

Because Rosebush's Complaint explicitly places Defendants on notice of his intent to plead "all claims available under" Michigan law if Michigan law applies, Rosebush Compl. ¶80, I will analyze his claims for design defect, manufacturing defect, and failure to warn, as negligence claims under Michigan law.[7] For the reasons which follow, Rosebush's claims are dismissed.

        a)      Design Defect

To state a design defect claim under Michigan law, a plaintiff must plausibly allege "(1) that the product was defective; (2) that the product was defective when it left the control of the defendant; and (3) that the defective product caused the plaintiff's injuries." *Meemic Ins. Co. v. Hewlett-Packard Co.*, 717 F. Supp. 2d 752, 768 (E.D. Mich. 2010). To establish that a product was defective, "a plaintiff must [plausibly allege] that '(1) the product was not reasonably safe when it left the control of the manufacturer; and (2) a 'feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product to the users.'" *Palatka v. Savage Farms, Inc.*, 535 F. App'x 448, 451–52 (6th Cir. 2013) (quoting *Croskey v. BMW of N. Am.*, 532 F.3d 511, 516 (6th Cir.2008)). Here, Defendants contend that Rosebush has failed to adequately allege causation, and I agree.

Rosebush alleges three principal defects in the design of the Prolene 3D. First, he alleges that the International Guidelines recommend against a "plug" design, as "[t]he incidence of erosion seems higher with plug versus flat mesh." Rosebush Compl. ¶38. Second, he alleges that the "multiple layers of Ethicon Multi-Layered Hernia Mesh increase the intensity and duration of the inflammatory response" caused by mesh hernia devices, which "increases dense adhesion formation," thereby

---

[7] I will address Rosebush's breach of implied warranty claim *infra*, under Count Eight. I note, however, because the analyses with respect to Rosebush's negligence and implied warranty claims are identical in these circumstances, *Hollister*, 201 F.3d at 736, the reasons upon which I dismiss Rosebush's negligence claims also provide an independent basis to dismiss his implied warranty claims.

"resulting in mesh contracture, mesh deformation, chronic pain, foreign body sensation, foreign body reaction, organ and tissue damage, hernia recurrence, and more." *Id.* ¶36. According to Rosebush, the "two connecting layers of polypropylene [are] intended to occupy two inguinal compartments once implanted, which greatly increases inflammation, adhesions, and mesh deformation." *Id.* ¶46. Finally, Rosebush alleges that the "polypropylene mesh material" used in the Prolene 3D "is unreasonably susceptible to in vivo oxidative degradation," which allegedly "causes or exacerbates excessive inflammation and adverse foreign body reaction, leading to shrinkage, scarification, pain, and mesh deformation." *Id.* ¶31. Rosebush further alleges that a "feasible alternative production practice was available," *Palatka*, 535 F. App'x at 451–52, in the form of "a flat, non-coated, single-layer, lightweight, large-pore mesh, or a fully resorbable mesh." Rosebush Compl. ¶47. During his 2019 surgery, Rosebush alleges that his surgeon discovered "dense adhesions [a]round the umbilical mesh" that was "previously placed" in Rosebush's abdomen during his 2009 surgery, and that a "portion of the small bowel was resected with [*sic*] portion of the mesh and removed." *Id.* ¶21. "As a direct and proximate result of Defendants' defective design," Rosebush alleges that he "has suffered and continues to suffer injuries and damages, including: past, present and future physical and mental pain and suffering; physical disabilities; and past, present, and future medical, hospital, rehabilitative, and pharmaceutical expenses." *Id.* ¶23.

Rosebush has failed to sufficiently allege that any of these defects caused his alleged injuries. *See Auto Club Grp. Ins. Co. v. All-Glass Aquarium Co., Inc.*, 716 F. Supp. 2d 686, 689 (E.D. Mich. 2010) (quoting *Skinner v. Square D. Co.*, 445 Mich. 153, 159 (1994)) ("'It is well-settled under Michigan law that a prima facie case for products liability requires proof of a causal connection between an established defect and injury.'"). With respect to the use of a "plug" design, although the International Guidelines indicate that "[t]he incidence of erosion seems higher with plug versus flat mesh," Rosebush Compl. ¶38, other than conclusory allegations, Rosebush does not further define

"erosion" or explain whether he experienced any of the injuries that a plug design allegedly makes more likely. *See, e.g.*, *Green v. Covidien LP*, Civ. No. 18-2939, 2021 WL 1198833, at \*\*5–6 (S.D.N.Y. Mar. 30, 2021) (dismissing hernia mesh design defect claim where plaintiff alleged the purported defect caused "serious bodily injuries" because plaintiff's statement of "causation does not explain how the [mesh's] defective design proximately caused [the p]laintiff's specific injuries").

Rosebush's allegations with respect to the multi-layered design are also inadequate. While Rosebush alleges that this feature "increase[s] the intensity and duration of the inflammatory response," thereby "increase[ing] dense adhesion formation"—an injury he allegedly incurred—he does not cite to any study, guidelines, or any other support for this proposition. *See Krulewich v. Covidien, LP*, 498 F. Supp. 3d 566, 576 (S.D.N.Y. 2020) (finding even citation to "one study" cautioning "against using polyester mesh" insufficient to plausibly allege "a causal link between the use of polyester and [plaintiff's] injuries" and granting motion to dismiss design defect claim). He alleges that the multi-layer design increases inflammation by "occupy[ing] two inguinal compartments once implanted," Rosebush Compl. ¶46, but he does not explain how the occupation of two compartments allegedly exacerbates a patient's inflammatory response. *See Moore v. C.R. Bard, Inc.*, 217 F. Supp. 3d 990, 995 (E.D. Tenn. 2016) ("Plaintiff must also allege *how* the alleged defect(s) caused his injuries."). Without further explanation, these allegations are conclusory and insufficient to state a claim. *See Bistrian*, 696 F.3d at 365.

Further, Rosebush has failed to differentiate his injuries from those that normally attend hernia repair surgery, with or without mesh. According to the FDA, based on its "analysis of medical device adverse event reports and of peer-reviewed, scientific literature, the most common adverse events for all surgical repair of hernias—with or without mesh—are pain, infection, hernia recurrence, scar-like tissue that sticks tissues together (adhesion), blockage of the large or small intestine (obstruction), bleeding, abnormal connection between organs, vessels, or intestines (fistula),

fluid build-up at the surgical site (seroma), and a hole in neighboring tissues or organs (perforation)." *Hernia Surgical Mesh Implants*, U.S. Food and Drug Admin., https://www.fda.gov/medical-devices/implants-and-prosthetics/hernia-surgical-mesh-implants.[8] Likewise, "[t]he most common adverse events following hernia repair with mesh are pain, infection, hernia recurrence, adhesion, and bowel obstruction." *Id.* Rosebush does not define a "dense adhesion" or elaborate on the injuries his surgeon discovered in 2019, and the Court is therefore unable to discern whether his injuries differ from those the FDA identified. But on the face of the Complaint, his alleged injuries appear to be consistent with those that are common to all mesh devices or all hernia repair surgeries. Accordingly, Rosebush has failed to plausibly allege that the multi-layered mesh design, in particular, proximately caused his injuries. *See Krulewich*, 498 F. Supp. 3d at 576 (dismissing hernia mesh design defect claim where plaintiff alleged use of polyester causes "severe inflammation" because the "injuries [the plaintiff] suffered were among the most common injuries caused by hernia surgeries using any type of mesh"); *Rincon v. Covidien*, Civ. No. 16-10033, 2017 WL 2242969, at *1 (S.D.N.Y. May 22, 2017) (dismissing hernia mesh design defect claim because "[n]othing in the [plaintiff's] Complaint even endeavors to explain why the mesh is a more likely, let alone proximate, cause of [her] alleged harms" compared to "several plausible [alternative] explanations").

Rosebush's allegations with respect to the Prolene 3D's polypropylene material are insufficient for similar reasons. Rosebush alleges that the "polypropylene mesh material" is "unreasonably susceptible to in vivo oxidative degradation," which allegedly "causes or exacerbates

---

[8] Although Rosebush does not refer to this document in his Complaint and Defendants do not raise it in their moving papers, it is a "public record," and the Court may "properly . . . consider" it on this Motion. *See Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir 1993); *Sparks*, 2021 WL 2649235, at *2 (citing, *e.g.*, *Funk*, 631 F.3d at 783) (noting that "[t]he Court may take judicial notice of publicly-available documents produced by the FDA" and taking judicial notice of the same information from the same FDA publication).

excessive inflammation and adverse foreign body reaction, leading to shrinkage, scarification, pain, and mesh deformation." Rosebush Compl. ¶31. But again, Rosebush does not cite to any materials supporting this proposition, nor does he explain the term "in vivo oxidative degradation" or provide any further explanation of how such degradation causes increased inflammation. *See Meredith v. Medtronic, Inc.*, Civ. No. 18-00127, 2019 WL 6330677, at *4 (S.D. Iowa Oct. 25, 2019) (dismissing design defect claim in part because plaintiff failed to allege "how the tissue attachment properties of the [relevant mesh product's] polyester caused his injuries"). Without further explaining how polypropylene causes the injuries Rosebush enumerates and whether he in fact experienced these injuries, his allegations pertaining to causation are conclusory and "do not suffice." *Iqbal*, 556 U.S. at 678.

While "'[a] plaintiff in a product liability action need not offer evidence which positively excludes every other possible cause,'" the plaintiff must "'establish[ ] a logical sequence of cause and effect, notwithstanding the existence of other plausible theories.'" *Auto Club Grp.*, 716 F. Supp. 2d at 689–90 (quoting *Mulholland v. DEC Int'l Corp.*, 432 Mich. 395, 415 (1989)). Rosebush has failed to allege "a logical sequence of cause and effect" explaining why the multi-layered polypropylene mesh design would have caused his particular injuries.

Accordingly, Rosebush's defective design claim is dismissed without prejudice, and he is given leave to amend his Complaint in accordance with this Opinion. *See Phillips*, 515 F.3d at 236 ("[A] district court must permit a curative amendment, unless an amendment would be inequitable or futile."); *Mills*, 406 F. Supp. 3d at 389.

> b)     Manufacturing Defect

"To establish a manufacturing defect, the plaintiff must show that: (1) the product was defectively manufactured; (2) the product reached the plaintiff in the same condition as it was when it left the manufacturer; and (3) the defect was the proximate cause of the plaintiff's damages."

*Meemic*, 717 F. Supp. 2d at 768. Under the first element, a plaintiff must establish that "'something [went] wrong in the manufacturing process and the product is not in its intended condition.'" *Strauch v. Raymond Corp.*, No. 254224, 2005 WL 3556107, at *2 (Mich. App. Dec. 29, 2005) (quoting *Prentis*, 421 Mich. at 683); *Fleck v. Titan Tire Corp.*, 177 F. Supp. 2d 605, 614 (E.D. Mich. 2001) (concluding plaintiffs must allege that the "accident product differs from comparable products typically produced by the manufacturer"). "[T]he product may be evaluated against the manufacturer's own production standards, as manifested by that manufacturer's other like products." *Prentis*, 421 Mich. at 683; *Gregory v. Cincinnati, Inc.*, 450 Mich. 1, 13 n.10 (1995).

Here, Rosebush's manufacturing defect claim fails because he has not plausibly alleged that the Prolene 3D implanted during his 2009 surgery deviated from Defendants' manufacturing standards. *See Moisenko v. Volkswagenwerk Aktiengesellschaft,* 100 F. Supp. 2d 489, 493 (W.D. Mich. 2000) (citing *Gregory,* 538 N.W.2d at 329) (dismissing manufacturing defect claim because plaintiff failed to establish "that the [product at issue] did not meet [the manufacturer's] standards"). Rosebush alleges that "[t]he products Defendants manufactured, including their Prolene 3D, . . . deviated in a material way from their manufacturing performance standards and/or differed from otherwise identical products manufactured to the same design formula." Rosebush Compl. ¶76; *see also* Compl. ¶108 ("The product differs from its intended result and/or from other ostensibly identical units of the same product line."). However, these allegations are conclusory and are "not entitled to the assumption of truth," *Bistrian*, 696 F.3d at 365, as they merely restate the elements of a claim and provide no factual basis on which to infer that the product implanted in Rosebush in fact deviated from Defendants' manufacturing standards. Accordingly, Rosebush's manufacturing defect claim is dismissed without prejudice, and he is given leave to amend in accordance with the principles outlined herein.

c)      Failure to Warn

"To establish a prima facie case of failure to warn, a plaintiff must [plausibly allege that]: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the defendant's breach was a proximate cause of the plaintiff's injuries; and (4) the plaintiff suffered damages." *Croskey*, 532 F.3d at 515 n.2; *Hill v. Bayer Corp.*, 485 F. Supp. 3d 843, 854 (E.D. Mich. 2020). "A manufacturer has a duty to warn if it has actual or constructive knowledge of a danger, which is not obvious to users, and the manufacturer failed to use reasonable care in informing users of the danger or the facts tending to make the condition dangerous." *Croskey*, 532 F.3d at 515 n.2; *see also Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 741 (6th Cir. 2000). Michigan follows the learned intermediary doctrine, under which "[a] manufacturer of a prescription drug [or device] has a legal duty to warn the medical profession, not the patient, of any risks inherent in the use of the drug [or device] which the manufacturer knows or should know to exist." *Brown v. Drake-Willock Int'l, Ltd*, 209 Mich. App. 136, 148 (1995) (quoting *Smith v. E.R. Squibb & Sons, Inc.*, 405 Mich. 79, 88 (1979)); *Hill*, 485 F. Supp. 2d at 854–55.

Rosebush alleges that Defendants' "product labeling and product data have failed to contain adequate information, instructions, and warnings concerning the following: implantation of the mesh, explantation of the mesh, propensity of the mesh to massively shrink and change shape, the increased duration and intensity of inflammation, and the elevated rate of adhesions, organ complications, chronic and debilitating pain, foreign body sensation, hernia recurrence, seroma, hematoma and fistula formation, erosion, extrusion, infection, and other injuries occurring at a higher rate than other surgically implanted devices." Rosebush Compl. ¶41; *see also id.* ¶61.

Based on these allegations, Rosebush has failed to plausibly allege a claim for failure to warn. First, Rosebush has not alleged the specific language in the warnings associated with the Prolene 3D, and as such, the Court is unable to assess the warnings against the omissions Rosebush alleges. *See*

*Bustamonte v. Atrium Medical Corp.*, Civ. No. 18-08395, 2020 WL 583745, at *7 (S.D.N.Y. Feb. 6, 2020) (concluding plaintiff failed to allege sufficient factual content to establish failure to warn claim in part because the plaintiff failed to allege "the exact language of the warnings contained on the device"); *Krulevich*, 498 F. Supp. 3d at 577–78 (comparing actual warnings to warnings plaintiff alleged manufacturer should have provided and dismissing failure to warn claim pertaining to hernia mesh in part because "[t]he warnings given noted the risks of the complications that [the plaintiff] actually experienced, namely, chronic pain, adhesion, and hernia recurrence"); *Nowell v. Medtronic Inc.*, 372 F. Supp. 3d 1166, 1250–51 (D.N.M. 2019) (noting that "for the Court to evaluate a warning's sufficiency, [plaintiff] must direct the Court to specific statements," and dismissing failure to warn claim pertaining to hernia mesh product).

Second, Rosebush has failed to adequately allege causation, as he has not "particularize[d] specific omissions or inadequacies supporting [his] allegations . . . beyond the generally accepted risks of hernia surgery." *Dunham v. Covidien LP*, Civ. No. 19-2851, 2019 WL 2461806, at *3 (S.D.N.Y. May 22, 2019) (dismissing hernia mesh failure to warn claim where plaintiff alleged warnings should have specified "the possibility of mesh migration, failure, chronic pain, and need for future surgeries"); *Nowell*, 372 F. Supp. 3d at 1251 (dismissing failure to warn claim in part because "many of the [alleged omissions from the defendant's warnings that the plaintiff] mentions are precisely the risks that the FDA considers attendant to all hernia repairs surgeries"). As such, he has failed to plausibly allege that any inadequacies in the warnings proximately caused his injuries.

Accordingly, Rosebush's failure to warn claim is dismissed without prejudice, and he is given leave to amend his Complaint in accordance with this Opinion.

### 4.    *Counts Four, Five, Six, and Seven: Bond*

Defendants contend that, under North Carolina law, Counts Four, Five, Six, and Seven of Bond's Complaint must be dismissed pursuant to a six-year statute of repose that applies to Bond's

claims under North Carolina law.[9] I agree, and Counts Four, Five, Six, and Seven of Bond's Complaint are therefore dismissed.

I have already determined, *supra*, that North Carolina's substantive law applies to Bond's products liability claims in Counts Four through Seven. In contrast with statutes of limitations, which create procedural rights, "statutes of repose are treated as substantive provisions for choice of law purposes." *Boudreau v. Baughman*, 322 N.C. 331, 341 (1988); *see also Se. Pa. Transp. Auth. v. Orrstown Fin. Servs. Inc.*, 12 F.4th 337, 350–51 (3d Cir. 2021) (citing *Lieberman v. Cambridge Partners, L.L.C.*, 432 F.3d 482, 492 (3d Cir. 2005)) ("We have held, consistent with other circuits, that statutes of repose create substantive rights . . . ."); *Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*, 721 F.3d 95, 109 (2d Cir. 2013) ("[I]n contrast to statutes of limitations, statutes of repose 'create[ ] a substantive right in those protected to be free from liability after a legislatively-determined period of time.'") (quoting *Amoco Prod. Co. v. Newton Sheep Co.*, 85 F.3d 1464, 1472 (10th Cir.1996)). Accordingly, as a substantive provision, North Carolina's statute of repose applies, here.

Until September 30, 2009, North Carolina applied a six-year statute of repose, codified at N.C. Gen. Stat. § 1-50(a)(6), to "action[s] for the recovery of damages for personal injury . . . based upon or arising out of any alleged defect or any failure in relation to a product." The statute began to run on "the date of initial purchase for use or consumption." "Unlike an ordinary statute of limitations which begins running upon accrual of the claim, the period contained in the statute of repose begins when a specific event occurs, regardless of whether a cause of action has accrued or whether any injury has resulted." *Black v. Littlejohn*, 312 N.C. 626, 633 (1985). "Thus, the repose serves as an unyielding and absolute barrier that prevents a plaintiff's right of action even before his cause of

---

[9] Defendants also move to dismiss Counts Eight and Nine of Bond's Complaint, which assert claims for breach of implied and express warranty, as barred by North Carolina's six-year statute of repose. I address Defendants' position as to Counts Eight and Nine of Bond's complaint *infra*.

action may accrue." *Id.* "All products liability claims, regardless of their nature, are subject to [N.C. Gen. Stat. § 1-50(a)(6)]." *Nat'l Prop. Inv'rs, VIII v. Shell Oil Co.*, 950 F. Supp. 710, 713 (E.D.N.C. 1996) (citing *Colony Hill Condominium I Assoc. v. Colony Co.*, 70 N.C. App. 390, 396 (1984), *review denied*, 312 N.C. 796 (1985)).

North Carolina subsequently amended its statute of repose applicable in products liability actions. Effective October 1, 2009, a plaintiff must bring an "action for the recovery of damages for personal injury . . . based upon or arising out of any alleged defect or any failure in relation to a product" no "more than 12 years after the date of initial purchase for use or consumption." *See* 2009 N.C. Sess. Laws 2009-420 § 2, *codified at* N.C. Gen. Stat. § 1-46.1(1). The amendment clarified that the twelve-year statute of repose "[became] effective October 1, 2009, and applies to causes of action that accrue on or after that date." 2009 N.C. Sess. Laws 2009-420 § 3. "[C]ourts applying North Carolina law have consistently applied N.C. Gen. Stat. § 1-50(a)(6)'s six-year statute of repose in cases where the product in question was first purchased or delivered . . . before October 1, 2009." *Cramer v. Ethicon, Inc.*, Civ. No. 20-95, 2021 WL 243872, at *4 (W.D.N.C. Jan. 25, 2021) (collecting cases) (finding plaintiff's pelvic mesh products liability "claims are governed by the six-year statute of repose in N.C. Gen. Stat. § 1-50(a)(6), because the latest date on which her [mesh device] could have been purchased for use or consumption was the date of her implantation surgery, April 2, 2007, two years before the effective date of N.C. Gen. Stat. § 1-46.1(1)"); *see also Robinson v. Bridgestone/Firestone N. Am. Tire, LLC*, 209 N.C. App. 310, 314–15 (2011) (applying six-year statute of repose in product liability action involving allegedly defective tires purchased before October 1, 2009, and declining to apply N.C. Gen. Stat. § 1-46.1(1)); *Lackey v. DePuy Orthopaedics, Inc.*, Civ. No. 10-00030, 2011 WL 2791264, at **3–4 (W.D.N.C. July 14, 2011) (applying North Carolina's six-year statute of repose in product liability action where allegedly defective product was purchased before October 1, 2009); *In re Elk Cross Timbers Decking Mktg.*, Civ. No. 15-18, 2015

WL 6467730, at *11 (D.N.J. Oct. 26, 2015) (same).

North Carolina's six-year statute of repose applies to Bond's Complaint and bars his claims in Counts Four through Seven. Bond contends that the twelve-year statute of repose now codified at N.C. Gen. Stat. § 1-46.1(1) applies to his claims because the six-year statute of repose previously codified at N.C. Gen. Stat. § 1-50(a)(6) applies only to actions that "accrue[d]" before October 1, 2009. *See* 2009 N.C. Sess. Laws 2009-420 § 3. According to Bond, his claims did not accrue until after that date. However, the overwhelming weight of authority leads to the conclusion that the six-year statute of repose applies to Bond's claims, as "the latest date on which [his Prolene 3D mesh device] could have been purchased for use or consumption was the date of [his] implantation surgery, [March 17, 2009]," which is more than six months "before the effective date of N.C. Gen. Stat. § 1-46.1(1)." *See Cramer*, 2021 WL 243872, at *4; Bond Compl. ¶20. Under the six-year statute of repose, Bond was required to bring his claims under North Carolina law no later than March 17, 2015. Because Bond did not file his Complaint until March 16, 2021—nearly six years after the expiration date—his claims are barred under North Carolina's statute of repose. Accordingly, Counts Four, Five, Six, and Seven of Bond's Complaint are dismissed with prejudice.

### B.     **Counts Eight and Nine**

#### 1.     *Rosebush*

Defendants move to dismiss Rosebush's breach of implied and express warranty claims, in Counts Eight and Nine, on the grounds that they are time-barred, that Rosebush failed to satisfy Michigan's requirement of providing pre-suit notice before filing a breach of warranty action, and that Rosebush fails to state a claim. While I disagree that these counts are time-barred, I agree that Rosebush failed to provide the requisite pre-suit notice and, on that basis, both counts are dismissed.

a)     Statute of Limitations

As the forum state in this diversity action, New Jersey's choice of law rules apply in determining the applicable statute of limitations. *Warriner*, 475 F.3d at 499–500 ("[I]n a diversity action, a district court must apply the choice of law rules of the forum state to determine what law will govern the substantive issues of a case."); *O'Boyle v. Braverman*, 337 F. App'x 162, 165 (3d Cir. 2009) (applying New Jersey choice of law rules to determination of applicable statute of limitations in case filed in New Jersey). The Court must first "determine[e] whether an actual conflict of law exists between the states involved," *Warriner*, 475 F.3d at 501, which occurs when choosing between two states' laws would be "outcome determinative." *McCarrell*, 227 N.J. at 584. Here, the two relevant states are New Jersey and Michigan. "If there is no actual conflict," the Court will apply the law of the forum state, New Jersey, "to resolve the disputed issue." *Rowe*, 189 N.J. at 621. If a conflict exists, the Court must then determine the applicable statute of limitations based on New Jersey's choice of law rules.

The record before me does not establish an outcome-determinative conflict between the relevant Michigan and New Jersey statutes of limitations. Michigan's three-year statute of limitations applicable in products liability actions, M.C.L. 600.5805(12), applies to claims for breach of implied and express warranty premised on an underlying personal injury. *See Boyd v. Keystone Lab., Inc.*, 774 F.2d 1161, at *1 (6th Cir. Sept. 27, 1985) (citing *Hanson v. American Motors Corp.*, 83 Mich. App. 553 (1978)) (applying three-year statute of limitations to breach of implied and express warranty claims premised on personal injuries sustained while using defendant manufacturer's hair care product). "A products liability claim 'accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results.'" *Peter v. Stryker Orthopaedics, Inc.*, 581 F. Supp. 2d 813, 816 (E.D. Mich. 2008) (quoting M.C.L. 600.5827). "[T]his statutory definition of 'accrues' prohibits use of the common law 'discovery rule[,]' . . . [which] provides that 'a claim does not accrue until a plaintiff knows, or objectively should know, that he has a cause of action and

can allege it in a proper complaint.'" *Id.* (quoting *Trentadue v. Gorton*, 479 Mich. 378, 389 (2007)). *Peter* addressed claims pertaining to a prosthetic knee that fractured, allegedly injuring the plaintiff. *See id.* at 816–17. The court indicated that the plaintiff's claims accrued on the date of his injury resulting from the allegedly defective prosthesis. *Id.* at 817. Applying that standard here, Rosebush's claims accrued when his injuries resulting from Defendants' allegedly defective surgical mesh first arose, which is not evident from the record.

Similar to Michigan, New Jersey applies the statute of limitations applicable to personal injury claims, N.J.S.A. 2A:14-2, where a plaintiff asserts a claim for breach of implied or express warranty based on personal injuries rather than mere property damage. *See Heavner v. Uniroyal, Inc.*, 63 N.J. 130, 133, 146 (1973), *abrogated on other grounds in McCarrell v. Hoffman-La Roche, Inc.*, 227 N.J. 569 (2017); *Spring Motors Distribs., Inc. v. Ford Motor Co.*, 98 N.J. 555, 569 (1985) (discussing distinction drawn in *Heavner* between statute of limitations applicable to personal injury actions versus those alleging mere economic loss).[10] Plaintiffs must bring personal injury actions within two-years of the date on which the action accrues. N.J.S.A. 2A:14-2(a). Unlike Michigan, New Jersey applies the "discovery rule," under which "the statute of limitations does not begin to run 'until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim.'" *McCarrell*, 227 N.J. at 578 (quoting *Lopez v. Swyer*, 62 N.J. 267, 272 (1973)). The discovery rule applies when a person is "unaware that he has sustained injury until after the statute of limitations has run," and when a person

---

[10] Defendants contend that the four-year statute of limitations under the Uniform Commercial Code, which accrues on the date of sale, applies to Rosebush's claims for breach of implied and express warranty. *See* Rosebush MTD, ECF No. 10-1 at 19–20. However, the precedent to which Defendants cite is inapposite because it does not concern implied and express warranty claims premised on personal injuries. *See Comm'rs of Fire Dist. No. 9, Iselin, Woodbridge, N.J. v. Am. La France,* 176 N.J. Super. 566, 571 (App. Div.1980) (addressing claim alleging breach of a warranty pertaining to the quality of the paint on a fire truck).

does not learn that his injuries are "attributable to the fault or neglect of another" until after the statute expires. *See Lopez*, 62 N.J. at 274. Here, even assuming Rosebush first discovered his injuries more than two years before filing suit, he was not on notice that his injuries are potentially attributable to Defendants until his corrective surgery on January 18, 2019, when his surgeon discovered dense adhesions around the mesh device in his abdomen. *See* Rosebush Compl. ¶21. Accordingly, under New Jersey's discovery rule, Rosebush's claims are timely.

Although the record is inconclusive as to the presence of an outcome-determinative conflict, even assuming a conflict does exist, the Court would apply New Jersey's statute of limitations. Under the second step of the choice-of-law analysis, the Court must apply the rules outlined in Section 142 of the Second Restatement. *See McCarrell*, 227 N.J. at 596–97. Section 142 dictates that "New Jersey, as the forum state, presumptively applies its own statute of limitations unless (1) New Jersey has no significant interest in the maintenance of the claim and [Michigan] has 'a more significant relationship to the parties and the occurrence,' or (2) given 'the exceptional circumstances of the case,' following the Second Restatement rule would lead to an unreasonable result." *Id.* at 597 (citing Rest. (Second) of Conflict of Laws § 142). The court will "[o]nly" address "whether 'the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence'" if it finds that "New Jersey ha[s] 'no substantial interest.'" *Id.* at 598 (quoting Rest. (Second) of Conflict of Laws § 142(2)(a)–(b)).

Here, the Court applies New Jersey's statute of limitations to Rosebush's breach of implied and express warranty claim. *McCarrell* concluded that "New Jersey has a substantial interest in deterring its manufacturers from developing, making, and distributing unsafe products." *Id.* (finding substantial interest in context of products liability claims against New Jersey prescription drug manufacturer). Similarly, here, New Jersey undoubtedly has a substantial interest in deterring its medical device manufacturers from manufacturing and distributing unsafe products in New Jersey

and in other states. As such, under *McCarrell*, the Court need not assess whether Michigan has a more significant interest for purposes of the applicable statute of limitations. *See id.* at 598 ("Only if we found that New Jersey had 'no substantial interest' would we address the second issue [of whether the other state's interest is more significant].").[11] Further, Defendants have not raised any "exceptional circumstances" such that "following the Second Restatement rule would lead to an unreasonable result," *id.* at 597, and the Court is unaware of any, either. Thus, New Jersey's statute of limitations applies.

Defendants have failed to establish that New Jersey's statute of limitations bars Rosebush's breach of implied and express warranty claims.[12] Defendants erroneously contend that New Jersey's four-year statute of limitations governing breach of contract claims brought under the UCC, N.J.S.A. 12A:2-725, which accrue at the time of sale, bars these claims. To the contrary, where a plaintiff asserts a claim for breach of implied or express warranty based on personal injuries, New Jersey courts apply N.J.S.A. 2A:14-2, *see Heavner*, 63 N.J. at 133, 146, which adopts a two-year statute of

---

[11] While *McCarrell* emphasized that it is not necessary to determine whether another state has a more significant interest where New Jersey's interest is substantial, the Court concluded in *dicta* that the competing state—Alabama—did not have a more significant interest than New Jersey for purposes of the applicable statute of limitations. *Id.* at 598. The same analysis applies here. Michigan—like Alabama in *McCarrell*—"has a substantial interest in ensuring that [medical] products entering its borders are safe for use by its citizens." *Id.* However, Michigan "does not have an interest in depriving one of its citizens of securing redress from a [medical device] company in another state where the statute of limitations has an equitable tolling feature," as is the case in New Jersey. *Id.*

[12] Rosebush did not oppose Defendants' argument that his breach of warranty claims are time-barred, and ordinarily, his failure to raise any opposition would waive both claims. *See Ferrante v. Amgen, Inc.*, Civ. No. 13-07344, 2014 WL 1092555, at *7 (D.N.J. Mar. 18, 2014) ("Courts in this District have held that the failure to respond to an argument advanced in support of a motion to dismiss results in a waiver of the claim sought to be dismissed."); *Leisure Pass N. Am., LLC v. Leisure Pass Group, Ltd.*, Civ. No. 12-3375, 2013 WL 4517841, at *4 (D.N.J. Aug. 26, 2013) ("Plaintiff has waived its opposition to this argument by failing to respond to it."). However, waiver is inappropriate here, where the basis on which Defendants move to dismiss Rosebush's claims is erroneous.

limitations and incorporates the discovery rule. *See McCarrell*, 227 N.J. at 578. As discussed *supra*, applying the discovery rule, Rosebush's breach of implied and express warranty claims are timely.

  b)  Failure to State a Claim

  I begin by applying New Jersey's choice-of-law rules to determine the substantive law applicable to Rosebush's breach of implied and express warranty claims.[13] First, there is a conflict between Michigan and New Jersey law. Whereas Michigan requires pre-suit notice before bringing a claim for breach of express or implied warranty, no such requirement applies under New Jersey law in these circumstances. *Compare Johnston v. PhD Fitness, LLC*, Civ. No. 16-14152, 2018 WL 646683, at *3 (E.D. Mich. Jan. 31, 2018) (concluding that for breach of express and implied warranty claims the "buyer must provide reasonable pre-suit notice to even a remote manufacturer" and that "filing suit does not amount to 'reasonable' notice"), *with In re Volkswagen Timing Chain Prod. Liab. Litig.*, Civ. No. 16-2765, 2017 WL 1902160, at *13, (D.N.J. May 8, 2017) ("Pre-suit notice is not required when the action is brought against a remote manufacturer and/or seller."); *see also Powell v. Subaru of America, Inc.*, 502 F. Supp. 3d 856, 876 (D.N.J. 2020) (finding conflict between Michigan and New Jersey breach of warranty laws based on Michigan's pre-suit notice requirement).

  Under the second step of the choice-of-law analysis, because "breach of express and implied warranty claims sound in contract, courts look to Section 188 of the Restatement to determine which state's law applies." *Arlandson*, 792 F. Supp. 2d at 704. "Section 188 . . . provides the following

---

[13] "Courts in this District have found in some cases that a choice of law inquiry as to contract-based claims is premature at the motion to dismiss stage." *Arlandson*, 792 F. Supp. 2d at 705. However, those decisions generally involved putative class actions, and in any event, "'[s]ome choice of law issues may not require a full factual record and may be amenable to resolution on a motion to dismiss.'" *Id.* at 700 (quoting *Harper*, 595 F. Supp. 2d at 491). This case is not a putative class action, and Rosebush has not identified any types of information that may further assist the Court in its choice-of-law determination. Accordingly, I find that it is not premature to conduct a choice-of-law analysis at this stage.

factors for assessing choice of law disputes: the (a) place of contracting; (b) place of negotiation of the contract; (c) place of performance; (d) location of the subject of the contract; and (e) domicile, residence, nationality, place of incorporation and place of business of the parties." *Powell*, 502 F. Supp. 3d at 876. In addition, "Section 6 provides general principles to consider and apply in all conflict analyses: '(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of [ ] law; (4) the interests of judicial administration; and (5) the competing interests of the states.'" *Id.* (quoting *Camp Jaycee*, 197 N.J. at 147).

The factors under Section 188 support the application of Michigan rather than New Jersey law. The places of contracting, negotiation, and performance are not as easily identified in these circumstances, where the plaintiff received the product via surgical implant from his physician. Nevertheless, all three factors favor the application of Michigan over New Jersey law. Rosebush received the Prolene 3D during his implantation surgery and discovered the alleged defects in the product during his corrective surgery, both of which occurred in Michigan. Rosebush Compl. ¶¶20–21. Rosebush does not have any connection to New Jersey in relation to his initial procurement and use of the Prolene 3D. For similar reasons, the "location of the subject of the contract," *Powell*, 502 F. Supp. 3d at 876, also favors Michigan, where Rosebush received the Prolene 3D and has used the product since his implantation surgery. *See* Rosebush Compl. ¶¶20–21. And Rosebush has been a Michigan resident during the period in which the Prolene 3D was implanted in his abdomen. Where all other Restatement factors favor application of Michigan law, the mere fact that Defendants maintain their "headquarters and principal place[s] of business in New Jersey" is not a sufficient basis upon which to apply New Jersey law. *See Powell*, 502 F. Supp. 3d at 877 (concluding that where all other Restatement factors favored Michigan law, mere fact that automobile manufacturer was headquartered and maintained its principal place of business in New Jersey, where it had allegedly generated the relevant warranties, was not a sufficient basis to apply New Jersey law).

Further, for the reasons discussed *supra* with respect to the law applicable to Counts One through Seven, the factors under Section 6 of the Restatement favor the application of Michigan law.[14]

Applying Michigan law, the Court must dismiss Rosebush's breach of implied and express warranty claims for failure to provide pre-suit notice.[15] Michigan law requires a buyer, "upon discovering a breach," to "provide reasonable pre-suit notice to even a remote manufacturer lest the buyer be barred from any remedy." *Johnston*, 2018 WL 646683, at *3 (citing *Gorman v. Am. Honda Motor Co., Inc.*, 302 Mich. App. 113, 127 (2013)). "Any remedy includes filing suit[,] . . . [a]nd filing suit does not amount to reasonable notice." *Id.* (internal quotations and citations omitted). Because Rosebush has failed to allege that he provided any adequate pre-suit notice, his breach of implied and express warranty claims in Counts Eight and Nine are dismissed without prejudice. *See id.* (dismissing implied and express warranty claims for failure to provide pre-suit notice).[16]

      2.    Bond

---

[14] The parties have not cited to any authority supporting the application of Restatement Section 146, rather than Section 188, to breach of implied and express warranty claims premised on personal injuries rather than mere property damage, and the Court is not aware of any, either. Nevertheless, even assuming Section 146 applies, the analysis under that section, *supra*, would dictate the application of Michigan law to Rosebush's breach of implied and express warranty claims.

[15] If I were to reach the merits, I would dismiss Rosebush's breach of implied warranty claims for the same reasons I dismissed his claims sounding in negligence, as the analyses are identical under these circumstances. *See Hollister*, 201 F.3d at 736.

[16] Moreover, because Rosebush did not respond to respond to Defendants' motion to dismiss Counts Eight and Nine for failure to provide pre-suit notice, Rosebush has waived these claims. *See Ferrante*, 2014 WL 1092555, at *7 ("Courts in this District have held that the failure to respond to an argument advanced in support of a motion to dismiss results in a waiver of the claim sought to be dismissed."); *Leisure Pass*, 2013 WL 4517841, at *4 ("Plaintiff has waived its opposition to this argument by failing to respond to it."); *Duran v. Equifirst Corp.*, Civ. No. 09-03856, 2010 WL 936199, at *3 (D.N.J. Mar. 12, 2010) ("The absence of argument constitutes waiver in regard to the issue left unaddressed, and that waives the individual counts themselves.").

Defendants move to dismiss Counts Eight and Nine of Bond's Complaint on grounds that these claims are time-barred under New Jersey's statute of limitations, barred under North Carolina's six-year statute of repose, and fail to plausibly allege claims on the merits. Although I disagree that these claims are time-barred under the applicable New Jersey statute of limitations, I agree that they are barred under North Carolina's statute of repose. Therefore, Counts Eight and Nine of Bond's Complaint are dismissed.

a)      Statute of Limitations

The record does not establish an outcome-determinative conflict between the relevant North Carolina and New Jersey statutes of limitations. In North Carolina, "'where bodily injury to the person . . . is an essential element of the cause of action[,]'" courts must apply "the three-year statute of limitations [under] N.C. Gen. Stat. § 1-52 [rather than] the four-year UCC statute of limitations under N.C. Gen. Stat. § 25-2-725." *Richardson v. Samsung Electronics Co., Ltd.*, Civ. No. 18-51, 2018 WL 7075136, at *3 (E.D.N.C. Dec. 5, 2018) (citing *Hanover Ins. Co. v. Amana Refrigeration, Inc.*, 106 N.C. App. 79, 82 (1992) (quoting *Bernick v. Jurden*, 306 N.C. 435, 444–45, (1982))), *report and recommendation adopted*, 2019 WL 248882 (E.D.N.C. Jan. 17, 2019) (applying three-year statute of limitations to breach of implied and express warranty claims premised on bodily injuries suffered following the explosion of a cellular phone that defendant manufactured). The cause of action accrues when "bodily harm to the claimant . . . becomes apparent or ought reasonably to have become apparent to the claimant, whichever event first occurs." N.C. Gen. Stat. § 1-52(16). As such, North Carolina applies the "discovery rule," which is "intended to apply to plaintiffs with latent injuries." *McCarver v. Blythe*, 147 N.C. App. 496, 499 (2001) (internal quotations omitted). Here, Bond evidently did not become aware of any purported injuries resulting from the Prolene 3D until undergoing corrective surgery on April 26, 2019. *See* Bond Compl. ¶21. Bond filed his Complaint on March 16, 2021, which is well within North Carolina's three-year statute of

limitations, even assuming Bond became aware of his injuries in the several months before his corrective surgery. Thus, Bond's claims are timely under North Carolina law. And, for the same reasons discussed *supra* with respect to Rosebush, Bond's claims are timely under New Jersey law.

Because there is no outcome-determinative conflict, the Court applies New Jersey's statute of limitations. *Rowe*, 189 N.J. at 621. And for the same reasons Rosebush's claims are timely under New Jersey law, Bond's claims are timely as well.

b)      Statute of Repose

Next, I determine the substantive law applicable to Counts Eight and Nine of Bond's Complaint. At the first step, there is an outcome-determinative conflict because a six-year statute of repose bars Bond's claims under North Carolina law, whereas New Jersey law imposes no such statute of repose. *See, e.g.*, *Cramer*, 2021 WL 243872, at *4 (finding plaintiff's pelvic mesh products liability "claims are governed by the six-year statute of repose in N.C. Gen. Stat. § 1-50(a)(6), because the latest date on which her [mesh device] could have been purchased for use or consumption was the date of her implantation surgery" came before October 1, 2009, the date on which North Carolina's twelve-year statute of repose became effective); Bond Compl. ¶20 (alleging that the Prolene 3D was implanted in Bond's groin on March 17, 2009).

At the second step, for the same reasons Michigan's substantive law applies to Rosebush's claims, North Carolina's substantive law applies to Bond's claims. And because "statutes of repose are treated as substantive provisions for choice of law purposes," *Boudreau*, 322 N.C. at 341, North Carolina's six-year statute of repose bars Bond's claims in Counts Eight and Nine. Accordingly, Counts Eight and Nine are dismissed with prejudice.

C.      **Count Ten**

In Count Ten, Plaintiffs assert claims for "[p]unitive [d]amages." However, "'[p]unitive damages' is not a cause of action, but one of a number of forms of relief that might apply should

some cause of action be proven." *Walker v. City of Newark,* Civ. No. 19-16853, 2020 WL 3542502, at *4 (D.N.J. June 30, 2020) (citing *Hassoun v. Cimmino*, 126 F. Supp. 2d 353, 372 (D.N.J. 2000)). Further, Count Ten is "redundant," *id.*, as Plaintiffs have requested punitive damages in their prayers for relief. Accordingly, Count Ten is dismissed. *Id.* While all the other counts in Bond's Complaint are dismissed with prejudice, to the extent Rosebush is able to plausibly allege causes of action in Count Four of his Complaint, he may seek punitive damages, to the extent authorized by law.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motions are **GRANTED**. With respect to Rosebush, Counts One, Two, Three, Five, Six, Seven, and Ten are dismissed with prejudice; Count Four as to negligence, which alleges claims under Michigan law for design defect, manufacturing defect, and failure to warn, is dismissed without prejudice, and Rosebush is given leave to amend his Complaint in accordance with this Opinion; Counts Eight and Nine of Rosebush's Complaint are also dismissed without prejudice. With respect to Bond, all counts are dismissed with prejudice. An appropriate form of Order is filed herewith.

Date: December 21, 2021                                    /s/ Freda L. Wolfson
                                                          Hon. Freda L. Wolfson
                                                          U.S. Chief District Judge